**MARATHON OIL COMPANY, Joan L. Savage, Barbara Cliff Toner, and Frank G. Cooley, as Personal Representative of the Estate of Cameron Cliff, Plaintiffs,**

v.

**Manuel LUJAN, Jr., Secretary of the Interior, Delos Sy Jamison, Director, Bureau of Land Management, and the Department of the Interior, Defendants.**

**Civ. A. No. 89–F–1829.**

United States District Court, D. Colorado.

June 20, 1990.

**1456**

Don H. Sherwood, James M. King, Sherman & Howard, Denver, Colo. and John S. White, Patton, Boggs & Blow, Washington, D.C., for plaintiffs.

Michael J. Norton, U.S. Atty., William G. Pharo, Asst. U.S. Atty., Denver, Colo. and Gerald S. Fish, Atty., Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

This case involves entitlement to oil shale mining patents by plaintiffs, owners of real estate in Western Colorado, and is the latest phase of extensive litigation concerning validity of claims to oil shale patents.[1] Questions presented are whether plaintiffs have complied with all requirements necessary for issuance of patents and whether defendants are acting beyond appropriate parameters in withholding patents.

Plaintiff Marathon Oil Company is a corporation organized under the laws of the State of Ohio. Plaintiffs Joan Savage and Barbara Cliff Toner are residents of Rifle, Colorado. Plaintiff Frank G. Cooley is a resident of Meeker, Colorado, and is the duly appointed representative of the estate of Cameron Cliff, a deceased individual.

Defendant Manual Lujan, Jr. is the Secretary of Interior of the United States. Defendant Delos Sy Jamison is the Director, Bureau of Land Management ("BLM"), of the Department of the Interior. Defendant Department of the Interior ("Department") is a United States agency. Defendants are charged with administration of the laws relating to the possession, purchase, and patenting of mineral lands in the public domain, 30 U.S.C. §§ 21 through 54. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1361. Venue is based on 28 U.S.C. § 1391(e)(3).

Procedurally, plaintiffs move the court for summary judgment. In the alternative, plaintiffs move for a writ of mandamus or mandatory injunction. Defendants also move the court for summary judgment. We have heard oral argument on the cross motions for summary judgment and on plaintiff's motions for other relief.

By way of summary, we find that plaintiffs have complied with existing mining law and other requirements, and no impediments for issuance of patents have been reported. Yet, the Department continues to delay issuance of patents. No persuasive reasons exist to justify Departmental inaction. In addition, the Department has abused its discretion and plaintiffs are entitled to issuance of patents. For reasons set forth, we find the issues in favor of plaintiffs on the question of mandamus and also grant summary judgment to plaintiffs.

The review that follows chronicles the irregular history of Departmental, legislative, and court decisions as they relate to assessment and discovery aspects of valid

---

**1.** Litigation over mining claims to oil shale lands encompasses over sixty years and includes numerous appeals to the Supreme Court and appellate courts. It is the objective of this opinion to resolve issues inherent in this litigation and also to add clarity and practical application of legal principles that impact mining law.

mining claims.[2] While the debate continues in the executive and legislative branches of government, definitive legal interpretation is necessary to bring consistency to mining law in the context of oil shale activity.[3]

## I. THE MARATHON LITIGATION; BACKGROUND

Plaintiffs own six contiguous association placer mining claims in western Rio Blanco County, Colorado. The claims were located on April 5, 1918, and comprise some 982.92 acres. ("Portland Claim Nos. 1–6"). On April 4, 1986, plaintiffs filed Mineral Application No. C–43354 in the Colorado State Office of the BLM ("local BLM"), pursuant to 30 U.S.C. §§ 35 and 37.

Plaintiffs' efforts to obtain patents run from early 1986 to 1990. We highlight crucial dates. From March 31, 1986 through June 1, 1987, the Department imposed an administrative moratorium on processing oil shale patent applications. On June 9, 1987, defendants notified plaintiffs that the local BLM would perform a miner-

al examination of the claims in June and July of that year, and requested that plaintiffs' representative locate sample points and identify completed assessment work. Field work was completed in late July, 1987.

On December 9, 1987, plaintiffs filed all proofs for patents required by 30 U.S.C. § 29, including an application to purchase claims and payment of purchase price.[4] The Department adjudicated the application, confirming that plaintiffs had met all requirements of posting notices, publication, title, improvements, survey, and other final proofs necessary for patents. The Department entered a Final Certificate for the claims on May 11, 1988. A final report was required, however, to validate the claims before patents could issue.[5]

On August 16, 1988, Marathon contacted the BLM office in Washington, D.C., questioning whether the mineral report was completed. Marathon formally requested that the Department release the mineral report to the applicants and place it in the public record. (Ex. 21). The Bureau ex-

---

**2.** We discuss the history of these decisions in detail in Appendix A.

**3.** In earlier opinions we have considered matters relating to discovery, performance of annual assessment work and other principles of mining and administrative law. *United States v. Eaton Shale Co.,* 433 F.Supp. 1256 (D.Colo. 1977); *Shell Oil Co. v. Kleppe,* 426 F.Supp. 894 (D.Colo.1977), *aff'd sub nom., Shell Oil v. Andrus,* 591 F.2d 597 (10th Cir.1979), *aff'd,* 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980); *Oil Shale Corp. v. Morton,* 370 F.Supp. 108 (D.Colo.1973); *Mobil Oil Co. v. Equity Co.,* No. C–4135, slip op. (D.Colo.1972). *Morton* was appealed, remanded, and readjudicated at the administrative and district court levels. *Morton,* Order of Remand, No. 9581–9584, slip op. (10th Cir. September 22, 1975). The resulting district court case, *Tosco Corp. v. Hodel,* 611 F.Supp. 1130 (D.Colo.1985), *vacated,* 826 F.2d 948 (10th Cir.1987) was appealed. Before a decision was issued on appeal the parties resolved the case.

**4.** The parties do not dispute that plaintiffs submitted a complete application on April 4, 1986, including: the application (Ex. 2); individual statements of citizenship (Ex. 2A); Marathon Oil Company's Certificate of Incorporation and proof of qualification to do business (Ex. 2B); Marathon Oil Company's resolution authorizing vice-presidents to appoint attorneys-in-fact and power of attorney (Ex. 2C); power of attorney

and letters of appointment (Ex. 2D); list of claims (Ex. 2E); map of claims (Ex. 2F); certified copies of location certificates and amendments (Ex. 2G); report on natural features on claims and evidence of discovery (Ex. 2H); affidavit regarding vein or lode deposits (Ex. 2I); affidavit regarding improvements and supplemental proof of improvements (Ex. 2J); proof of posting notice on claims (Ex. 2K); restricted homestead patents within the boundaries of the claims (Ex. 2L); and an abstract of title (Ex. 2M—omitted by stipulation).

Plaintiffs submitted notice of their application for a patent in the Colorado State Office of the BLM on June 12, 1987, and the notice was posted on June 17. Plaintiffs submitted their final proofs of posting notice on December 8, 1987, including: 1) proof of continuous posting of claims; 2) affidavit of publisher; 3) payment of purchase price; 4) statement of charges paid; 5) application to purchase. Plaintiffs' proofs also include affidavits of assessment work for a number of years, and letters clarifying ownership interest.

**5.** The Mineral Entry Final Certificate, in pertinent part, reads as follows:

> THEREFORE: Patent may issue if all is found regular upon demonstration and verification of a valid discovery of a valuable mineral deposit and subject to the reservations, exceptions, and restrictions noted herein.

pressed concern about standards used to determine the validity of the claims. (Ex. 23).

On December 6, 1988, the Department enunciated its standards for determining valid oil shale claims.[6] The standards follow rationale expressed in *Freeman v. Summers*, 52 L.D. 201 (1927), and *Andrus v. Shell Oil Co.*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980):[7]

> An exposure of the prospectively valuable rich beds of oil shale of the Green River Formation within the boundaries of the mining claim yielding 15 gallons or more of shale oil per ton of rock, in beds not less than one foot thick, yielding 1500 barrels or more per acre. Further, this standard may be met by an exposure of marlstone tongue of the Green River Formation, yielding not less than three gallons of shale oil per ton of rock upon destructive distillation, inferred to connect to the uppermost strata of prospectively valuable rich beds of oil shale lying at depth within the boundaries of the mining claim, but the inferred connection of the qualifying marlstone tongue need not occur within the confines of the mining claim.

Ex. 24.[8]

On December 16, 1988, the Department ordered the local BLM to complete processing of plaintiffs' patent application. The local BLM estimated that all patent materials could be completed by February 15, 1989. In late December, the Department confirmed that the *Freeman* and *Andrus* standards should apply to plaintiffs' claims. (Ex. 28).[9]

Around February 1, 1989, the Department issued its Final Mineral Report on plaintiffs' claims. The report's conclusions remain undisputed—it recommends patenting of plaintiffs' valid mining claims. This needed action has never been forthcoming. From February 1989 to June 1990, final patents remain in administrative limbo.

## A. A LOCATOR OR OWNER HAS A VESTED PROPERTY INTEREST IN HIS CLAIM

■ Rights to patents vest upon issuance of the final certificate, conditioned on subsequent field work that verifies valid discovery and compliance with other requirements. *Benson Mining Co. v. Alta Mining Co.*, 145 U.S. 428, 431–32, 12 S.Ct. 877, 878–79, 36 L.Ed. 762 (1891); *Davis v. Nelson*, 329 F.2d 840, 845 (9th Cir.1964); *Utah Int'l, Inc. v. Andrus*, 488 F.Supp. 976 (D.Colo.1980).[10] Our review of long-established law indicates that oil shale claimants have vested property rights. Such property rights grant owners rights to alienate, are subject to taxation, and cannot be divested if claimants demonstrate substantial compliance with maintenance requirements enumerated under the mining law. In like manner, patents shall issue upon compliance with prerequisites to patenting claims.

---

**6.** The standards appear in a letter from James Cason, Deputy Assistant Secretary, Land and Minerals Management, Bureau of Land Management to Hon. John Melcher, Chairman, House of Representatives Subcommittee on Mineral Resources Development and Production, Committee on Energy and Natural Resources. (Ex. 24).

**7.** In *Freeman,* the Department invalidated the "prudent person" test and validated the existence of rich beds of oil shale in the Green River Formation in Colorado. The Portland Claims lie in this formation. In *Andrus,* the Supreme Court affirmed the Department's approach in *Freeman.* A discussion of both decisions appears later.

**8.** We explain the geology of the Green River Formation along with a brief discussion of oil shale in Appendix B.

**9.** On January 19, 1989, the Department announced its intention to publish the December standards in the Federal Register for public comment. (Ex. 33). Subsequent letters, dated January 23, January 30, and February 2, 1989 (Exs. 33, 35, 37), for example, discuss proposed rules, but apparently no further action has been taken to publish them.

**10.** Indeed, "... when the purchase price is paid the right to a patent immediately arises." *Benson Mining Co.* 145 U.S. at 431–32, 12 S.Ct. at 878–79; *see also Silver King Co. v. Conkling Mining Co.*, 255 U.S. 151, 162, 41 S.Ct. 310, 312, 65 L.Ed. 561 (1921); *El Paso Brick Co. v. McKnight,* 233 U.S. 250, 259, 34 S.Ct. 498, 501, 58 L.Ed. 943 (1914); *Black v. Elkhorn Mining Co.*, 163 U.S. 445, 450–51, 16 S.Ct. 1101, 1103, 41 L.Ed. 221 (1895).

■ Mining claims, in the language of the Supreme Court, are "real property in the fullest sense."[11] Legal title to land remains in the United States, but claimants enjoy valid, equitable, possessory title, subject to taxation, transferrable by deed or devise and otherwise possessing incidents of real property.[12] *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930), describes the interest held by a locator of a mining claim:

> When the location of a mining claim is perfected under the law, it has the effect of a grant by the United States of the rights of present and exclusive possession. The claim is property in the fullest sense of the term; and may be sold, transferred, mortgaged, and inherited without infringing any right or title of the United States. The right of the owner is taxable by the state; and is "real property" subject to the lien of a judgment recovered against the owner in a state or territorial court.... The owner is not required to purchase the claim or secure patent from the United States but so long as he complies with the provisions of the mining laws, his possessory right, for all practical purposes of ownership, is as good as though secured by patent....

*Krushnic*, 280 U.S. at 316–17, 50 S.Ct. at 104; *see also United States v. Locke*, 471 U.S. 84, 86, 105 S.Ct. 1785, 1788, 85 L.Ed.2d 64 (1985).

■ Claims can be mined indefinitely without application for patent. So long as annual assessment work is performed, locators of claims can hold possessory title indefinitely.[13] Also, claim holders can seek patent by certifying application to the proper land office on completion of $500 worth of annual work, pursuant to 30 U.S.C. § 29.

■ The law is well-settled. Upon compliance with requirements of 30 U.S.C. § 29, the applicant's right to a mineral patent mature, and the Department has no authority to withhold patents under such circumstances. *Locke*, 471 U.S. at 86, 105 S.Ct. at 1788; *Krushnic*, 280 U.S. at 318–19, 50 S.Ct. at 105; *Union Oil Co. v. Smith*, 249 U.S. at 349, 39 S.Ct. at 311; *South Dakota v. Andrus*, 614 F.2d 1190, 1193 (8th Cir.), *cert. denied*, 449 U.S. 822, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980); *United States v. Kosanke Sand Co.*, 12 I.B.L.A. 282, 290–91 (1973); 2 *American Law of Mining* § 9.04 (2d ed. 1984); *Morrison's Mining Rights* 164–65 (16th ed. 1936). The vested right arises when claimants comply fully with procedures set forth in federal mining laws for obtaining patents. *See Freese v. United States*, 639 F.2d 754, 758, 226 Ct.Cl. 252, *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 103 (1981); *Wilcoxson v. United States*, 313 F.2d 884, 888 (D.C.Cir.), *cert. denied*, 373 U.S. 932, 83 S.Ct. 1538, 10 L.Ed.2d 690 (1963); *see also Wyoming v. United States*, 255 U.S. 489, 497, 41 S.Ct. 393, 395, 65 L.Ed. 742 (1921); *Benson Mining Co.*, 145 U.S. at 433, 12 S.Ct. at 879.[14]

**11.** *See also Cole v. Ralph*, 252 U.S. 286, 295, 40 S.Ct. 321, 325, 64 L.Ed. 567 (1920); *Union Oil Co. v. Smith*, 249 U.S. 337, 349, 39 S.Ct. 308, 311, 63 L.Ed. 635 (1919); *Bradford v. Morrison*, 212 U.S. 389, 395, 29 S.Ct. 349, 351, 53 L.Ed. 564 (1909); *Elder v. Wood*, 208 U.S. 226, 28 S.Ct. 263, 52 L.Ed. 464 (1908); *Forbes v. Gracey*, 94 U.S. 762, 24 L.Ed. 313 (1876).

**12.** *See Shell Oil Co. v. Andrus*, 591 F.2d 597 (10th Cir.1979), *aff'd*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980).

**13.** Law regarding assessment work requirements is central to mining law and developed concurrently with law regarding valid discoveries. We discuss each in detail both later in this opinion and in Appendix A.

**14.** Further, any challenge to a mining claim involves the divestiture of an interest in real property. Forfeitures are not favored. *See, e.g., City and Cty. of Denver, Acting By and Through Bd. of Water Comm'n v. Bergland*, 517 F.Supp. 155 (D.Colo.1981), *aff'd in part, rev'd in part*, 695 F.2d 465 (10th Cir.1982); *United States v. Smith*, 497 F.Supp. 459 (N.D.Iowa, 1980), *rev'd*, 659 F.2d 97 (8th Cir.1981). The party seeking forfeiture of a mining claim must make a strong showing. Traditional mining law has always put this burden on a rival claimant. Because enactment of the Act made location by rival claimants impossible, the same burden should be imposed on the Department, who now stands in the shoes of a contestant or rival claimant. 2 *American Law of Mining* § 46.03[6] (2d ed.1984). *See also* 54 Am.Jur. *Mines and Minerals* § 69 (1971) (doubt is resolved against the one seeking forfeiture).

■ Plaintiffs have a vested property interest in their claims and are entitled to' patents. Thus, patents must issue on plaintiffs' claims, pending final Departmental approval.

## B. ·THE DEPARTMENT ABUSED ITS DISCRETION

■ We have considered and reject the proposition that Departmental inaction is warranted. We believe the opposite. Decisive action is necessary to set a future course in this area of law, given years of delay and overall governmental inaction. To this end, we agree with plaintiffs that the Department has abused its discretion in refusing to act with finality on plaintiffs' oil shale patent application.

### 1. The Department's Role in the Patent Process is Ministerial in Nature

As noted, full compliance with statutory prerequisites entitles a claim holder to a patent. The Department's function in acting upon the application is not discretionary, and in an appropriate and compelling situation a patent's issuance can be compelled by court order. *Krushnic,* 280 U.S. at 318–319, 50 S.Ct. at 105; *Roberts v. United States,* 176 U.S. 221, 231, 20 S.Ct. 376, 879, 44 L.Ed. 443 (1900); *South Dakota v. Andrus,* 614 F.2d at 1193. A respected treatise on the topic states explicitly:

It has been contended, unsuccessfully, that the granting of a mineral patent is a matter which is "by law committed to agency discretion." This view fails to recognize the fundamental distinction between the mining laws and the mineral leasing laws. Under the mineral leasing laws the Secretary may, in his discretion, refuse to issue any lease or prospecting permit at all on a given tract. *The locator of a mining claim, however, holds his claim by virtue of an Act of Congress. Upon compliance· with the requirements of the mining laws, he is entitled to a patent, and the Secretary has no discretion to deny an application for a mineral patent where all the requirements of law have been met.* Thus, in the mining laws, Congress chose

a method of disposing of public lands whereby the recipient of the grant had only to prove that he met the requirements of the law in order to have the *rights he obtained by location confirmed by patent.* The power confided by the Secretary with respect to the issuance of mineral patents is not that of granting or denying a privilege but of determining whether an existing privilege conferred by Congress has been lawfully exercised....

2 *American Law of Mining* § 9.04 (emphasis added); *see also Krushnic,* 280 U.S. at 315, 50 S.Ct. at 104.

■ Our examination of law and commentary relating to vesting of property rights clearly establishes that the Department's role in the patenting process is ministerial. 30 U.S.C. § 29 places responsibility with the claimant to comply with legal requisites to patent his claim. The Department, then, acts to check the validity of the claimant's application and to process the claim.

### 2. The Department Must Act in a Timely Manner

■ The agency's actions in processing plaintiffs' patent application are effectively complete. *Sierra Club v. Thomas,* 828 F.2d 783, 793–96 (D.C.Cir.1987); *Nader v. FCC,* 520 F.2d 182, 187 (D.C.Cir.1975); *Envtl. Defense Fund v. Hardin,* 428 F.2d 1093, 1098–1100 (D.C.Cir.1970); *Deering Milliken, Inc. v. Johnston,* 295 F.2d 856, 864–65 (4th Cir.1961). Agency inaction in this case may be likened to agency recalcitrance; the agency denies its statutory duty to go forward, and, in effect, abdicates its statutory responsibility. The Department's inaction essentially denies the plaintiffs their entitlement to property. Thus, the administrative inaction in this case is sufficiently final and ripe to permit and justify judicial review. *Pub. Citizen Health Research Group v. Comm'r, FDA,* 740 F.2d 21, 32 (D.C.Cir.1984); *Hardin,* 428 F.2d at 1100; *see also Sierra Club v. Thomas,* 828 F.2d at 492; *EEOC v. Liberty Loan Corp.,* 584 F.2d 853, 856 (8th Cir. 1978); *British Airways Bd. v. Port Auth.*

*of New York and New Jersey*, 564 F.2d 1002, 1010 (2d Cir.1977); *Ass'n of Am. R.R. v. Costle*, 562 F.2d 1310, 1321 (D.C.Cir. 1977). Additional passage of time will not prompt any different course by defendants. No expectation is present that the Department will act differently at a later point. There is no prospect of resolution of this matter short of mandamus and our grant of summary judgment in favor of plaintiffs.

The Department's mandate as a public agency requires attentive administration of public lands: "The Department of the Interior, created in 1849, is the preeminent caretaker of the public lands, administering more than 500 million acres of federal land, and with trust responsibilities for approximately 50 million additional acres ... The Department has primary responsibility for implementation of mineral legislation, such as the general mining law." 5 *American Law of Mining* § 185.02[1]. In *Cameron v. United States*, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920), the court explained the Department's role as follows:

> By general statutory provisions the execution of the laws regulating the acquisition of rights in the public lands and the general care of these lands is confided to the land department, as a special tribunal; and the Secretary of the Interior, as the head of the department, is charged with seeing that this authority is rightly exercised to the end that valid claims may be recognized, invalid ones eliminated, and the rights of the public preserved. Rev.Stats. §§ 441, 453, 2478; *United States v. Schurz*, 102 U.S. 378, 395 [26 L.Ed. 167]; *Lee v. Johnson*, 116 U.S. 48, 52 [6 S.Ct. 249, 250, 29 L.Ed. 570]; *Knight v. United States Land Association*, 142 U.S. 161, 177, 181 [12 S.Ct. 258, 263, 35 L.Ed. 974]; *Riverside Oil Co. v. Hitchcock*, 190 U.S. 316 [23 S.Ct. 698, 47 L.Ed. 1074].

*Cameron*, 252 U.S. at 459–60, 40 S.Ct. at 412.

The Department's duties derive directly from statutory mandate and are supported by numerous legal authorities. As caretaker of public lands, the Department is entrusted with the duty to act in determining valid and invalid claims. No party disputes that the Department has a role in determining valid mining claims.[15] More fundamental is that the Department should never play a non-role; the Department's duty is to act.

The Administrative Procedure Act ("APA") defines the standard to which defendants shall be held. *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 685 (D.C.Cir.1982), *vacated in part on reh'g en banc sub nom.*, *San Luis Obispo Mothers for Peace v. United States Nuclear Reg. Comm'n*, 760 F.2d 1320 (D.C.Cir. 1985), *cert. denied*, 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). Under the APA, "administrative agencies have a duty to decide issues presented to them within a reasonable time ... and reviewing courts have a duty to 'compel agency action unlawfully withheld or unreasonably delayed.'" *Thompson v. United States Dep't of Labor*, 813 F.2d 48, 52 (3d Cir. 1987); *Nader*, 520 F.2d at 206; *Deering Milliken*, 295 F.2d at 863–64.[16] As the court observed in *Deering Milliken:*

> There are no absolute standards by which it may be determined whether a proceeding is being advanced with reasonable dispatch. What is reasonable can be decided only in the light of the nature of the proceedings and the general and specific problems of the agency in discharging its functions and duties.

*Deering Milliken*, 295 F.2d at 867.

Indeed, *Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1034 (D.C.Cir.1983) states:

> [T]here must be a 'rule of reason' to govern the time limit to administrative proceedings. Quite simply, excessive de-

---

**15.** See *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336–38, 83 S.Ct. 379, 382–83, 9 L.Ed.2d 350 (1963); *Knight v. United States Land Ass'n*, 142 U.S. 161, 178, 12 S.Ct. 258, 262, 35 L.Ed. 974 (1891); *Rawls v. Secretary of Interior*, 460 F.2d 1200 (9th Cir.1972), *cert. denied*, 409 U.S. 881, 93 S.Ct. 209, 34 L.Ed. 135 (1972).

**16.** 30 U.S.C. § 29 is silent on the scope of judicial review in this case.

lay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decision-making into future plans.

*Potomac Elec. Power Co.*, 702 F.2d at 1034; *see also Nader*, 520 F.2d at 207.

Authority to change Departmental regulations and policies does not relieve a Department head from the obligation of following existing regulations and policies. Our holding takes on additional force because, as noted, mining claims constitute an interest in real property and carry possessory rights that cannot be effectively nullified without basic aspects of fairness and due process of law. The question is not whether the Department has power to change regulations and policies, but whether the Department follows the basic notion of procedural due process that requires government officials to follow the law as it exists until it is changed. *Shell Oil v. Andrus*, 591 F.2d 597 (10th Cir.1979), *aff'd*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980).

■ The locator's interest cannot be arbitrarily, unreasonably or unfairly dissolved, terminated or effectively denied at the Department's election by inconsistent and spotty application of rules and policies. *Shell Oil*, 591 F.2d at 597. An interest can only be divested for substantial reasons,

for example, lack of compliance with section 37 of the 1920 Mining Act.[17] The Department's inaction has effectively divested the plaintiffs of their property interests, and the Department has thereby abused its discretion.[18]

The Department has suspended processing patents on several occasions; taken as a whole, they have substantially interfered with plaintiffs' rights to patents on their claims. The delay creates uncertainty for future plans with respect to the plaintiffs' claims. While we recognize that good government can mean cooperation between agencies and Congress, cooperation must ultimately serve constituents. Mutual inaction serves no public interest. Analyzing documentary evidence and other submissions and filings in the case conjures images of the Department and Congress in a bureaucratic stalemate.

For example, in March, 1987, the Department issued a moratorium on processing claims. The Department intended, instead, to study all available information regarding oil shale and to report its findings to Congress.[19] By early 1988, the Department expressed intentions to commence processing claims in December of that year. (Ex. 25). In December, and again in January of 1989, various Congressmen urged the Department to drop its processing plans. The Department renewed its moratorium until

**17.** Title 30 U.S.C. § 37 sets forth procedures for patenting claims.

**18.** Plaintiffs emphasize the constitutional deprivation of property without due process as part of their argument. The court declines to explore that issue in great detail, but plaintiffs' argument is noteworthy.

**19.** In a March 18, 1987 letter to Hon. Morris K. Udall, the Chairman, House of Representatives Committee on Interior and Insular Affairs, the Department explained its reasons for delay until June 1, 1987:

Delaying adjudication in this manner affords the opportunity to share with Congress information being gathered from an intensive Departmental review of the oil shale situation while ensuring irreversible decisions or commitments are not made prematurely.

At the end of its efforts, the Department will know the number and status of its oil shale

mining claims, will have proposed standards for discovery, and will have identified various options for managing the remaining claims. This information will be shared with Congress, allowing all interested parties the opportunity to address the issues and discuss the options with a common framework of more complete knowledge.

Ex. 9.

Instead of resuming the process in June, 1987, the Department continued an indefinite moratorium on patenting claims. In correspondence between the BLM and the National Wildlife Federation, the Department assured the Federation that "no other oil shale patents will be issued until the Department completes its review to determine which standards should be used, and then the approved standards will be applied to these oil shale claims.... Rest assured that the Department of the Interior is in no headlong rush to patent oil shale mining claims...." (Ex. 14).

at least 1990.[20]

The Department is under no legal obligation to perpetuate a moratorium on patenting mining claims. Indeed, the Department is awaiting a Congressional signal that may not come soon.[21] The debate over oil shale policies continues. Meanwhile, the property interests of plaintiffs and other claim holders are inordinately tied to intricacies of administrative and legislative processes.

## C. RELIEF IN THE NATURE OF MANDAMUS IS APPROPRIATE

■ District courts have jurisdiction to compel defendants to perform their ministerial duty to issue mineral patents to the plaintiffs. 28 U.S.C. § 1361 provides:

The district courts have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

28 U.S.C. § 1361.

The mandamus remedy is limited to cases in which no other recourse is available. *United States v. Jenkins,* 866 F.2d 331, 333 (10th Cir.1989). It is a drastic and extraordinary remedy, used sparingly in federal courts. Mandamus is appropriate where the person seeking the relief "can show a duty owed to him by the government official to whom the writ is directed that is ministerial, clearly defined and peremptory." *Carpet, Linoleum & Resilient Tile Layers v. Brown,* 656 F.2d 564, 566 (10th Cir.1981); *Schulke v. United States,* 544 F.2d 453, 455 (10th Cir.1976).

... 28 U.S.C. § 1361 gives the district court jurisdiction to issue a mandatory injunction. The injunctive remedy is provided for by the Administrative Procedure Act, 5 U.S.C. § 706(1), where a court reviewing agency action is authorized to "compel agency action unlawfully withheld." Thus, in *Carpet, Linoleum and Resilient Tile Layers,* 656 F.2d at 567, we concluded that a mandatory injunction is essentially in the nature of mandamus, and jurisdiction can be based on either 28 U.S.C. § 1361, § 1331, or both.

*Estate of Smith v. Heckler,* 747 F.2d 583, 591 (10th Cir.1984).

While the judiciary is not a "super agency," controlling the affairs of another branch of government, "even in an area generally left to agency discretion, there may well exist statutory or regulatory standards delimiting the scope or manner in which such discretion can be exercised. In these situations, mandamus will lie when the standards have been ignored or violated." *Estate of Smith,* 747 F.2d at 591 (quoting *Davis Associates, Inc. v. Secretary, Dep't of H.U.D.,* 498 F.2d 385, 389 and n. 5 (1st Cir.1974)). If the court determines, after studying both the statute and its legislative history, "that the defendant has failed to discharge that Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose." *Estate of Smith,* 747 F.2d at 591; *Carpet, Linoleum and Resilient Tile Layers,* 656 F.2d at 566. Mandamus will lie to compel the Department to act. *Krushnic* 280 U.S. at 318–19, 50 S.Ct. at 105; *Lane v. Hoglund,* 244 U.S. 174, 181, 37 S.Ct. 558, 560, 61 L.Ed. 1066 (1917); *Ballinger v. Frost,* 216 U.S. 240, 249–50, 30 S.Ct. 338, 340–41, 54 L.Ed. 464 (1910); *United States ex rel. Dunlap v. Black,* 128 U.S. 40, 9 S.Ct. 12, 32 L.Ed. 354 (1888); *United States v. Schurz,* 102 U.S.

**20.** A letter dated February 7, 1990 to Hon. Nick Rahall, Jr., Chairman, House of Representatives Subcommittee on Mining and Natural Resources, concerning the instant litigation states: In a statement on February 28, 1989, made by Principal Deputy Assistant Secretary James E. Cason, you were advised that no patents to oil shale mining claims would be issued until 1990, and in no case until final rules establishing standards have been promulgated, notwithstanding the fact that it is the Department's position that final rules are not legally required in order to process the application. While this continues to be Departmental policy, please be aware that reconsideration of this policy may be necessary as the litigation continues. Ex. 45.

**21.** Rocky Mountain News, April 26, 1990 at 37, col. 1; Denver Post, June 16, 1990 at 7, col. 3 (article by Professor Jan G. Laitos, University of Denver College of Law).

378, 403, 26 L.Ed. 167 (1880); *cf., Miguel v. McCarl*, 291 U.S. 442, 451, 54 S.Ct. 465, 466, 78 L.Ed. 901 (1934); *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931); Annotation. *Construction and Application of 28 U.S.C.S. § 1361 Conferring on Federal District Courts Original Jurisdiction of Actions in Nature of Mandamus to Compel Federal Officer, Employee, or Agency to Perform Duty Owed Plaintiff.* 13 A.L.R.Fed. 145. A further consideration in exercising the court's power to issue a writ is the importance of the problem. *Jenkins*, 866 F.2d at 333; *Journal Publishing v. Mechem*, 801 F.2d 1233 (10th Cir.1986).

30 U.S.C. § 29 imposes on the Department a well-defined duty to issue mineral patents upon satisfaction of relevant statutory requirements. No other remedy is available to compel Departmental action on plaintiffs' patents. Only court intervention will compel agency action for plaintiffs. Seeking a writ of mandamus is appropriate in this situation, where plaintiffs have demonstrated that agency discretion is limited in scope and Departmental officials have ignored agency standards.[22] *Schulke v. United States*, 544 F.2d 453, 455 (10th Cir. 1976); *State Highway Comm'n v. Volpe*, 479 F.2d 1099, 1104, n. 6 (8th Cir.1973); *see also Thompson v. U.S. Dep't of Labor*, 813 F.2d at 52; *Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir.1986); *Estate of Smith v. Heckler*, 747 F.2d 583, 591 (10th Cir.1984). Plaintiffs' rights are effectively denied by Departmental delay. And, plaintiffs' rights are tied to development of oil shale in Colorado. Resolution of issues inherent in this litigation will clarify and assist resolution of other litigated matters in cases involving interpretation of mining law.

## D. SUMMARY JUDGMENT

Plaintiffs have established a clear case for issuance of a writ of mandamus. We believe, however, that as an alternative and independent remedy, this is an appropriate case for summary judgment.

---

**22.** Mandamus can still issue even when the interpretation of a controlling statute is not entire-

Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules of Civil Procedure as a whole, which are designed to secure the "just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Willner v. Budig*, 848 F.2d 1032, 1033–34 (10th Cir.1988), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). The plain language of Rule 56(c) mandates entry of summary judgment against the party who fails sufficiently to show the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

In reviewing a motion for summary judgment, the court must view evidence in the light most favorable to the party opposing the motion, and resolve all doubts in favor of triable issues of fact. *World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985); *Ross v. Hilltop Rehabilitation Hosp.*, 676 F.Supp. 1528 (D.Colo.1987). Only disputes over facts that might affect the outcome of the case will properly preclude entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, a movant's initial burden is slight. In its response, the nonmovant's burden is generally greater. In *Celotex*, the Supreme Court held that the language of Rule 56(c) does *not* require the moving party to show an *absence* of issues of material fact in order to be awarded summary judgment. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. That is, Rule 56 does not require the movant to *negate* the opponent's claim. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. The

ly free from doubt. *13th Regional Corp. v. Dep't of Interior*, 654 F.2d 758, 760 (D.C.Cir.1980).

movant merely has initial responsibility to inform the court of the motion's basis and to identify those portions of the record that show a lack of genuine issue. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. This burden is discharged merely by pointing out to the court an absence of evidence to support the nonmovant's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. On the other hand, the nonmovant has the burden of showing that there *are* issues of material fact to be determined. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. In order to dispute the facts demonstrated by the movant's evidence, the nonmovant must offer evidence, and cannot rely on mere conclusory allegations. *McVay v. Western Plains Service Corp.,* 823 F.2d 1395, 1398 (10th Cir.1987); *R–G Denver, Ltd. v. First City Holdings of Colorado, Inc.,* 789 F.2d 1469, 1471 (10th Cir.1986).

As noted above, we have applied principles of summary judgment. No conflict exists in the chronology of key events. Actions and procedures completed by plaintiff mineral claim holders are without refutation. Lack of action of the mining claims by defendant administrator is clear and applicable mining and administrative law supports the position of plaintiffs. Plaintiffs have clearly established the fact that no genuine issue of material fact exists. Defendants have not carried their burden on summary judgment principles. Thus, we find that no genuine issues of material fact exist. On separate grounds, we hold that the uncontroverted facts and conclusions of law provide a basis for finding in favor of plaintiffs on summary judgment. As a matter of law, then, the court grants summary judgment in favor of plaintiffs and against defendants.

## II. THE LAW REGARDING ASSESSMENT AND VALIDATION OF OIL SHALE INTERESTS

A review of legal principles that form the underpinnings of issues in this opinion is necessary. Patenting a mining claim requires proper location, compliance with assessment work requirements, and validation of valuable mineral deposits. 30 U.S.C. §§ 22, 23, 25, 29, 35 and 37. Major decisions in mining law regarding assessment and validation of mining claims are highly irregular and at times inconsistent.[23] We briefly chronicle this history below. A more detailed discussion appears in Appendix A.

In enacting the Mining Law of 1872, Congress declared that "all valuable mineral deposits in lands belonging to the United States" are "free and open to exploration and purchase, and the lands in which they are found to occupation and purchase." 30 U.S.C. § 22. Congress, however, provided that "no location of a mining-claim shall be made until the discovery of the vein or lode within the limits of the claim [is] located." 30 U.S.C. § 23. The mining law sets up a legal blueprint by which private parties can discover, own, extract, and market valuable minerals including oil shale from public lands.

Under the Mineral Leasing Act of 1920, lands previously open to location and patent became available solely on a lease basis. However, previously located valid claims which were in existence on February 25, 1920 are protected by 30 U.S.C. § 193, which allows such claims to continue to qualify for patents so long as "thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery."

---

**23.** We rely in part on our decision in *Tosco Corp. v. Hodel,* 611 F.Supp. 1130 (D.Colo.1985). Although the case was settled while pending in United States Court of Appeals for the Tenth Circuit, and various holdings of the district court in *Tosco* were ordered vacated, the rationale of the district court opinion is precedential. *See, e.g., United States v. Articles of Drug,* 818 F.2d 569, 572 (7th Cir.1987); *Armster v. United States Dist. Ct.,* 806 F.2d 1347 (9th Cir.1986); *Ringsby Truck Lines, Inc. v. Western Conference* of Teamsters, 686 F.2d 720 (9th Cir.1982); *United States v. Louisiana–Pacific Corp.,* 682 F.Supp. 1122, 1138 (D.Colo.1987); *Ertl v. Hodel,* 663 F.Supp. 1126 (D.Colo.1987); *United States v. Excellair, Inc.,* 637 F.Supp. 1377, 1385 (D.Colo. 1986); *Tetlin Native Corp. v. Alaska,* 759 P.2d 528 (Alaska, 1988); *Mayberry v. Univ. of Colo. Health Sci. Ctr.,* 737 P.2d 427, 430 (Colo.App. 1987); S.Rep. No. 494, 101st Cong.2d Sess., 3, 13, 20 (1990); Plaintiffs' Brief in Support of Summary Judgment at 9, n. 4 (March 1, 1990).

## A. ASSESSMENT WORK REQUIREMENTS

Maintaining valid claims requires performance of annual work. The requirement assures good faith and diligence in developing claims and prevents promiscuous location of mining claims without performing work to maintain them. Performing annual work also serves as notice to other potential locators to refrain from occupying, locating, or developing the property.

When legislators passed the 1920 Mineral Leasing Act, failure to perform annual assessment work did not constitute an immediate forfeiture of the claim; nor did it render an immediate self-destruct or sudden death effect on the claim.[24] Immediate forfeiture never was law and finds no support in reported cases.

The General Mining Act of 1872 provides that, once a claim is located "and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year." 30 U.S.C. § 28. Upon a showing that at least "$500 worth of labor has been expended or improvements made upon the claim by [the claimant] or grantors," the claimant is entitled to a patent which passes full fee title to the claimant. 20 U.S.C. § 29; *Freese*, 639 F.2d at 754.

Prior to *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), the provisions regarding annual assessment work were construed to relate solely to rights of other miners to challenge and relocate claims upon which annual work was not performed. The government had no direct interest in the matter, being concerned only with assuring that mineral-bearing lands were kept open for private development. 30 U.S.C. § 22; *see also Krushnic*, 280 U.S. at 306, 50 S.Ct. at 103; *Barklage v. Russell*, 29 I.D. 401 (1900); *McEvoy v. Megrinson*, 29 I.D. 164 (1899). *See generally* 2 *Lindley on Mines* § 624. Furthermore, determination of possessory rights between rival claimants was committed to the courts. *Barklage*, 29 I.D. at 401.

In *Hickel*, the Supreme Court ruled that rival claimants are not the only parties who can challenge a claim for failure to perform annual assessment work. The United States, as beneficiary of invalid claims, also has rights, through the Department, to challenge claims for failure to perform annual work. With regard to the amount of work necessary to maintain a claim, the Court announced its doctrine of "substantial compliance":

> We agree with the Court in *Krushnic* and *Virginia–Colorado* that every default in assessment work does not cause

---

**24.** In describing how failure to perform annual work operates on mining claims, an authoritative and classical treatise in wide use at the time of the 1920 Act states:

> The penalty for failure to comply with the requirement of the law, in respect to the performance of annual labor, is found in section twenty-three hundred and twenty-four of the Revised Statutes:—
>
> Upon a failure to comply with these conditions, the claim or mine upon which such failure occurs shall be open to relocation in the same manner as if no location of the same had ever been made.
>
> The term "forfeiture" does not appear in the statute, but the courts employ it as a comprehensive word indicating a legal result flowing from a breach of condition subsequent, subject to which the locator acquires his title.
>
> In a previous section we have noted the distinction between forfeiture and abandonment, and have there enumerated the leading characteristics of both. We have heretofore observed the reluctance with which the courts enforce this penalty. They have settled the doctrine that the forfeiture cannot be established except upon clear and convincing proof of the failure of the former owner to have work performed or improvements made to the amount required by law.
>
> While it is often said that a forfeiture can be shown only upon "clear and convincing evidence," the proof is made as required whenever it is shown by a preponderance of the evidence that the full amount of annual labor or improvements was not made or expended within a given year.
>
> The courts do not incline to the enforcement of this class of penalties, which have always been deemed in law odious.
>
> Of course, while a claim is subject to relocation for failure to perform the requisite annual labor, no forfeiture is worked, and the estate of the locator is not divested until there has been a peaceable entry for the purpose of perfecting the relocation. The right of the original claimant is terminated only by the entry of a new one.
>
> 2 *Lindley on Mines* § 645 (3d ed.1914).

the claim to be lost. Defaults, however, might be the equivalent of abandonment; and we now hold that token assessment work, or assessment work that does not substantially satisfy the requirements of 30 U.S.C. § 28, is not adequate to "maintain" the claims within the meaning of § 37 of the Leasing Act ... [W]e conclude that [*Krushnic* and *Virginia–Colorado*] must be confined to situations where there had been substantial compliance with the assessment work requirements of the 1872 Act, so that the "possessory title" of the claimant, granted by 30 U.S.C. § 26, will not be disturbed on flimsy or insubstantial grounds.

*Hickel*, 400 U.S. at 57, 91 S.Ct. at 201.

Since *Hickel*, the Department has generally construed 30 U.S.C. § 28 as a requirement of actual performance of $100 worth of assessment work each successive year until a final certificate of patent is issued. Any default in compliance with 30 U.S.C. § 28 constitutes failure to comply substantially with section 28 and thereby warrants invalidation of the claim. Contrary to that position the Supreme Court has set forth a more practical and flexible standard of performance of annual assessment work "so that the 'possessory title' of the [mining] claimant will not be disturbed on flimsy or insubstantial grounds." *Hickel*, 400 U.S. at 57, 91 S.Ct. at 201. We adhere to this less rigid standard rather than that interpreted by the Department.

In *Hickel*, the Supreme Court unequivocally held that something measurably less than literal compliance satisfies the statutory requirements. "[W]e now hold that token assessment work [25], or assessment work that does not substantially satisfy the requirements of 30 U.S.C. § 28, is not adequate to 'maintain' the claims within the meaning of § 37 of the Leasing Act." *Hickel*, 400 U.S. at 57, 91 S.Ct. at 201. Furthermore, a rich history of mining law has evolved in the Western United States since the early 1800's. Decisions considering whether actual or substantial compliance with mining statutes is required clearly state that substantial compliance is suffi-

cient. Such compliance, measured primarily by a good faith standard, is sufficient. *See, e.g., Continental Oil Co. v. Natrona Serv., Inc.*, 588 F.2d 792 (10th Cir.1978) (interpreting the Supreme Court's opinion in *Union Oil Company v. Smith*, 249 U.S. at 337, 39 S.Ct. at 308 as requiring substantial compliance with the element of possession and working); *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978) (affording indulgence to a miner who attempts to comply with laws regarding the perfection of a valid location in good faith); *Lombardo Turquoise Milling & Mining Co., Inc. v. Hermanes*, 430 F.Supp. 429 (D.Nev.1977), *aff'd*, 605 F.2d 562 (9th Cir. 1979) (under Nevada law, senior locators were held to a standard of substantial compliance with statutes regarding certificate of location); *Inman v. Ollson*, 213 Or. 56, 321 P.2d 1043 (1958) (citing to well-established rule that substantial compliance with mining laws is all that is generally required); *Scoggin v. Miller*, 64 Wyo. 206, 189 P.2d 677 (1948) (defendants did not forfeit rights under placer mining claims where they made a good faith effort to comply with statutory requirements). Finally, the Court in *Locke* reiterated that less than full compliance does not automatically result in invalid claims. Rather, less than full compliance "would subject the claimant to a case-by-case determination of whether he nonetheless intended to keep his claim." *Locke*, 471 U.S. at 102, 105 S.Ct. at 1796.

Because the Court noted that both cases fall within the ambit of "substantial compliance," both *Krushnic* and *Virginia–Colorado* provide indications of the term's meaning. Both cases involve defaults in performing annual assessment work of at least one year. In *Virginia–Colorado*, defaults took place over a number of years, including 1932–1935, while the case was appealed. *Hickel* finds that its decisions in *Krushnic*, and *Virginia–Colorado*, reflect "a judicial attitude of fair treatment for claimants who have substantially complet-

---

**25.** We equate "token assessment work" with minimal, nominal or slight work.

ed" annual work requirements. *Hickel,* 400 U.S. at 52, 91 S.Ct. at 199. *Hickel*'s interpretation of *Krushnic* and *Virginia–Colorado* means that assessment work need not be performed every year; the Court's imprimatur follows long established mining law.[26]

Indeed, a treatise existing when the 1920 Mineral Leasing Act took effect states that the $100 annual work requirement must be performed in good faith; no stringent and exacting requirements exceed this threshold standard. Although critical of the practice, the author notes that "[t]here is probably no single provision of the law which is evaded to a greater extent than this one." 2 *Lindley on Mines* § 624.

In sum, a review of American mining law indicates that the claimant's possessory title will not be disturbed despite minor variances with statutory requirements, if a claimant attempts good faith performance of annual work.

 In our view, sections 28 and 29 of title 30, regarding annual assessment work requirements and receipt of a certificate of patent upon completion of $500 worth of work, form integral parts of the same mining law and therefore must be construed in harmony. Under section 28, payment of the annual $100 assessment requirement grants the locator *possessory rights* to develop the claim and allows the locator to demonstrate the land's mineral character. Fee title still remains in the United States. However, section 29 requires not less than $500 worth of development work for each claim. If other requirements are also fulfilled, the United States has a duty to convey fee simple title to the applicant and the government's title is divested. Awarding the patent constitutes delivery of fee simple title to the patent holder.

An oil shale claimant who has fulfilled the $500 patent work requirement substantially complies with annual work requirements. If $500 in payment can exact a patent from the United States, spending this amount should also fulfill annual work requirements. Compliance with the $500

requirement set forth in 30 U.S.C. § 29 satisfies the "substantial compliance" requirements of section 28.

## B. VALIDATION OF OIL SHALE INTERESTS

In enacting the Mining Law of 1872, Congress declared that all discoveries of valuable mineral deposits are free and open to purchase. 30 U.S.C. § 22. Congress, however, failed to define the meaning of "valuable," "mineral deposits," or "discovery." Thus, other adjudicatory bodies have contributed various definitions of what constitutes a valuable mineral deposit.

### 1. *Castle v. Womble,* 19 L.D. 455 (1894)

An early formulation of the test for determining a valuable mineral deposit is set forth in *Castle v. Womble,* 19 L.D. 455 (1894). The Department declared that:

> After a careful consideration of the subject, it is my opinion that where minerals have been found and the evidence is of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met.

*Castle,* 19 L.D. at 457.

The *Castle* test, or the "prudent person" test, tests present economic feasibility. It ascertains, as objectively as possible, whether a "reasonable" mining claimant can economically justify spending his labor and means to mine the minerals he has found. If so, then his mining claim is "valid." Many earlier pronouncements follow this rule. *See Cole v. Ralph,* 252 U.S. 286, 307, 40 S.Ct. 321, 330, 64 L.Ed. 567 (1920); *Cameron v. United States,* 252 U.S. at 459, 40 S.Ct. at 412; *Montana Cent. Ry. Co. v. Migeon,* 68 F. 811, 817 (C.C.Mont.1895); *aff'd,* 77 F. 249 (9th Cir. 1896); *United States v. Iron Silver Mining Co.,* 128 U.S. 673, 683–84, 9 S.Ct. 195, 199, 32 L.Ed. 571 (1888).

---

**26.** We discuss these points in greater detail in Appendix A.

In *Chrisman v. Miller,* 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770 (1905), the Supreme Court approved *Castle.* The case involved a controversy between two rival claimants to the same property. The case's holding states:

> It is true that when it is between two mineral claimants the rule respecting the sufficiency of a discovery of mineral is more liberal than when it is between a mineral claimant and one seeking to make an agricultural entry.... But even in such a case, as shown by the authorities we have cited, there must be such a discovery of mineral as gives reasonable evidence of the fact either that there is a vein or lode carrying the precious mineral, or if it be claimed as placer ground that it is valuable for such mining.

*Chrisman,* 197 U.S. at 323, 25 S.Ct. at 471.

Other later cases adopt the "prudent person" test. *See United States v. Coleman,* 390 U.S. 599, 602, 88 S.Ct. 1327, 1330, 20 L.Ed.2d 170 (1968), *reh'g denied,* 391 U.S. 961, 88 S.Ct. 1834, 20 L.Ed.2d 875 (1968); *Best,* 371 U.S. at 335–36, 83 S.Ct. at 381–82; *Cameron* 252 U.S. at 459, 40 S.Ct. at 412. In *Coleman,* the Supreme Court states:

> Under the mining law Congress has made public lands available to people for the purpose of mining valuable mineral deposits and not for other purposes. The obvious intent was to reward and encourage the discovery of minerals that are valuable in an economic sense. Minerals which no prudent man will extract because there is no demand for them at a price higher than the cost of extraction and transportation are hardly economically valuable.

*Coleman,* 390 U.S. at 602, 88 S.Ct. at 1330.

2. *Freeman v. Summers,* 52 L.D. 201 (1927)

The Department radically changed the *Castle* test in *Freeman v. Summers,* 52 L.D. 201 (1927). The quality and quantity of mineral deposits found in a mining claim, central considerations under the "prudent person" test, are rendered mean-

ingless under *Freeman. Freeman*'s rule of discovery constitutes a special principle of mining law and has unique application to oil shale placer claims. It rejects marketability and embraces geologic inference that rich shale oil beds exist below the surface.

*Freeman* initially involved a private contest between claimants in which the Department intervened. Summers held a homestead entry at odds with prior claims owned by Freeman. Freeman contested the Summers claims, but his protests were dismissed because he had not discovered a valuable mineral deposit.

The initial *Freeman* decision, issued in January of 1924, held:

> While there appears to be no question but that immense shale beds underlie this land at a considerable depth, it is just as clear that the higher strata exposed on the Summers place, and on which discovery is claimed, do not now constitute valuable deposits and by development in the future could not be expected to show such value as to make them merchantable. Hence, it is our opinion that on such deposits a discovery cannot be predicated on which to base a valid mineral claim to the land.[27]

Through a course of events, the order was reissued. The Secretary signed the official order on September 30, 1927. The order changed the law on the nature of a valid discovery. Because of its importance, we quote the opinion at length:

> From the foregoing it follows that the law requires as a prerequisite to a valid location that the mineral be discovered within the limits of the claim located; that the mineral indications shall be such as to warrant a prudent man in the further expenditure of time and money, with a reasonable prospect of success. In order to warrant that proceeding, he must have discovered mineral in such situation and such formation that he can follow the vein or the deposit to depth, with a reasonable assurance that paying minerals will be found. In other words, the discovery of an isolated bit of mineral,

---

**27.** *Tosco,* 611 F.Supp. at 1171–172.

not connected with or leading to substantial prospective values, is not a sufficient discovery; but a mining locator is not expected to find at the surface or in a shallow working a body of mineral which can be immediately mined and reduced at a profit. It is sufficient, as already stated, if he finds mineral in a mass so located that he can follow the vein or the mineral-bearing body, with reasonable hope and assurance that he will ultimately develop a paying mine.

In this case it appears from the evidence submitted at the original hearing and rehearing that actual discoveries of mineral were made either on the surface or in shallow workings. The existence of oil shale in northwestern Colorado is a matter of common knowledge, and the deposits have been the subject of exploration and study for a number of years....

They [oil shale deposits] have been recognized by the Department and by Congress as a very valuable natural mineral resource. They have been the subject of treatment in a large number of experimental reduction plants, one of which was provided for by Congress and is now in operation.

While at the present time there has been no considerable production of oil from shales, due to the fact that abundant quantities of oil have been produced more cheaply from wells, there is no possible doubt of its value and of the fact that it constitutes an enormously valuable resource for future use by the American people.

It is not necessary, in order to constitute a valid discovery under the general mining laws sufficient to support an application for patent, that the mineral in its present situation can be immediately disposed of at a profit.....

The evidence in this case shows that in this particular area of Colorado the lands contain the Green River Formation and that this formation carries oil shale in large and valuable quantities; that while the beds vary in the richness of their content, the formation is one upon which the miner may rely as carrying oil shale which, while yielding at places comparatively small quantities of oil, in other places yields larger and richer quantities of this valuable mineral.

In other words, having made his initial discovery at or near the surface, he may with assurance follow the formation through the lean to the richer beds....

After careful consideration of the entire record the department has reached the conclusion that the locations are valid and, if otherwise regular, are entitled to pass to patent under the general mining laws. Prior departmental decisions in this case are accordingly recalled and vacated, the decision of the Commissioner of the General Land Office affirmed, and the homestead entries of 018825 and 018827 of George L. Summers held for cancellation, because made upon lands covered by prior valid mineral locations. Motion sustained.

*Freeman,* 52 L.D. at 204–07.

The *Freeman* case crystallizes the following principles: First, a finding of lean surface deposits warrant the geologic inference that claims contain rich valuable deposits below the surface. Second, this principle holds true regardless of whether the Green River Formation is one homogenous mass or instead contains barren beds between the upper and lower formations. Third, a valid discovery does not depend on a quantum oil yield from distillation of outcroppings. Fourth, oil shale is a valuable mineral and present profitability is no requisite to patentability.

The opinion is not based on any homogenous mass theory; resolution of this question is not necessary to the clear meaning of *Freeman.* The 1927 decision constitutes an absolute acceptance of geologic inference as proof that rich oil shale beds exist. It unequivocally accepts that lean surface outcroppings can be followed through the various formations to the rich mineral oil shale beds.[28]

---

**28.** A further discussion of the geology of oil shale in Colorado appears in Appendix B.

The Department consistently followed *Freeman* from 1927 through 1960. Significant Congressional action affecting patenting of oil shale claims came in 1956 with passage of the Act of July 20, 1956, 70 Stat. 592, 30 U.S.C. § 122. This Act facilitates patenting of the remaining oil shale claims under 30 U.S.C. § 193 by eliminating the requirement that applicants must also obtain patents to surface rights. However, Congress did not specifically address the problem of discovery.

3. *United States v. Winegar*, 16 I.B. L.A. 112 (1974)

Forty-seven years later, in *United States v. Winegar*, 16 I.B.L.A. 112 (1974), the Board reversed its approach, overruling *Freeman*, and stating that *Freeman* is "clearly contrary to the mining law." *Winegar*, 16 I.B.L.A. at 168. The I.B.L.A. also found in *Winegar* that:

Many millions have been spent on oil shale since the revival of interest in this mineral in the early 1900's. But substantially all of the expenditures that could be considered prudent were for (1) research and development of a technically and economically feasible mining and reporting process, or (2) purchase of mining claims. Until a research program has demonstrated that shale oil could be produced at a cost competitive with petroleum, no prudent person would attempt to develop an oil shale mine. He would have no market for his product. The very fact that, in the more than half a century of interest in oil shale claims for the Green River Formation, not one profitable mine has been developed is a compelling reason for concluding that expenditure of money to that end would be imprudent.

*Winegar*, 16 I.B.L.A. at 157–58.

The Board concluded that:

First, as an historical fact, the commercial production of oil from oil shale has never been competitive with the liquid petroleum industry. Second, the hypothetical studies at best confirm that the commercial exploitation of oil shale would not be competitive with the liquid petroleum industry. Third, without exception, every oil shale operation that has been attempted in this country has failed to show profitable production. Fourth, appellees have held these claims for half a century without attempting to exploit them.

It is unlikely that any oil shale operation could have operated at a profit at the time these claims were located or at any time up to and including the time of these contest proceedings.

In order for a commercially profitable operation to come into being there must be either a dramatic improvement in the technology or an alteration in the forces which have always operated in this country to prevent the commercial production of oil shale. The significant increases in national and world population, the increasing American per capita demand for energy, the diminution of available supplies and reserves of other energy sources, the complexities of international politics and economics, and the new awareness of environmental considerations, all acting in combination, may indeed soon compel consumers to accept shale oil and to pay what always theretofore would have been an exorbitant and noncompetitive price.

However, speculation that oil shale may someday be valuable in an economic sense is not evidence of its present value as of 1920 or 1966. The right to receive title to federal public land cannot be supported by such speculation.

*Id.* at 163–66.

Thus, issuance of patents was terminated and the Department contested all existing oil shale claims. Significantly, the termination was without advance notice to numerous interested parties. The Department, in effect, attacked the principal holdings in *Freeman*. These contests mark a complete deviation from the rules, instructions, interpretation and standards which unequivocally existed from 1915.

4. *Andrus v. Shell Oil Co.*, 446 U.S. 657 (1980)

In *Andrus v. Shell Oil Co.*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980), the

Supreme Court rejected the reasoning and conclusions of the Board of Land Appeals in *Winegar* and approved our interpretation of *Freeman*. The Supreme Court observes that *Freeman* "involved two distinct issues: (1) whether a finding of lean surface deposits warranted the geological inference that the claim contained rich 'valuable' deposits below; and (2) whether present profitability was a prerequisite to patentability." *Andrus*, 446 U.S. at 667, 100 S.Ct. at 1938. Both issues are answered affirmatively and the claimant prevailed in the litigation. The Supreme Court concluded that geologic inference is sound and that no doubt exists that oil shale constitutes an enormously valuable resource for future use by American people.[29] The Supreme Court speaks with exactness on this point.

The Court reasoned that:

By withdrawing "oil shale in lands valuable for such minerals" from disposition under the general mining law [by the enactment of the Mineral Leasing Act of 1920], the Congress recognized—at least implicitly—that oil shale *had been* a locatable mineral.... [O]nce it was settled that oil shale was a mineral subject to location, and once a savings clause was in place preserving preexisting claims, it was fully expected that such claims would be patentable. The fact that oil shale then had no commercial value simply was not perceived as an obstacle to that end.

. . . .

Our conclusion that Congress in enacting the 1920 Mineral Leasing Act contemplated that pre-existing oil shale claims could satisfy the discovery requirement of the mining law is confirmed by actions taken in subsequent years by the Interior Department and the Congress.

To hold now that *Freeman* was wrongly decided ... would require us to conclude that the Congress in 1930–1931 closed its eyes to a major perversion of the mining laws. We reject such a conclusion.

*Andrus*, 446 U.S. at 665–67, 671, 100 S.Ct. at 1937–39, 1940.

The Court held that "the original position of the Department of the Interior, as enunciated in the 1920 Instructions and in *Freeman v. Summers* is the correct view of the Mineral Leasing Act as it applies to the patentability of [oil shale] claims." *Andrus*, 446 U.S. at 673, 100 S.Ct. at 1941.[30]

Following the Congressional investigation into the Department's policy on patenting oil shale lands, the Department immediately resumed patenting oil shale lands under the *Freeman* standard. "Rarely has an administrative law decision received such exhaustive Congressional scrutiny. And following that scrutiny, no action was taken to disturb the settled administrative practice...." *Andrus*, 446 U.S. at 673, n. 12, 100 S.Ct. at 1941, n. 12. Congress took no action to enact legislation following the inquiry, and the Department followed *Freeman* for forty years. *Andrus* gives this longstanding policy further vitality, affirming the lower court's expansive rulings.

■ Review of the legislative history and subsequent administrative and Congressional action under the Mineral Leasing Act of 1920 also indicates that Congress actually ratified a liberalized version

---

**29.** The circuit court highlighted the government's acknowledgement of valid discovery requirements. The court stated:

The Department by 1920 had thus determined that oil shale deposits, if demonstrated to contain sufficient oil, were "valuable mineral deposits" although there was no immediate market.

The government in these proceedings has acknowledged that these claims met the discovery requirements under the 1916 to 1920 standards applied by the Department of the Interior. This was because there has been an administrative determination that valid loca-

tions could then be made on the Green River Formation oil shale beds if all other elements of a proper location were present. The geology was obviously well known, uncomplicated, and the beds were conspicuous.

*Shell Oil Co. v. Andrus*, 591 F.2d 597, 599 (10th Cir.1979).

**30.** Defendants contend that *Castle* is the Department's "original" position. The reference in *Andrus*, however, goes to the position the Department held just after passage of the 1920 Mineral Leasing Act.

of the *Freeman* rule of discovery. The 1920 instructions, promulgated by the Department three months following the law's enactment, disclose that oil shale was sufficiently valuable to be legally discoverable despite lack of prospects for immediately profitable development.

This administrative ruling, a contemporaneous construction provided by administrators who are charged with enforcement of the Act and thus intimately familiar with the Act's legislative history, is highly persuasive. *United States v. Leslie Salt Co.,* 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956); *Norwegian Nitrogen Prod. Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933); *United States v. Philbrick,* 120 U.S. 52, 59, 7 S.Ct. 413, 417, 30 L.Ed. 559 (1887); *Brennan v. Udall,* 379 F.2d 803, 806–7 (10th Cir.), *cert. denied,* 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967).

Congress' ratifying *Freeman,* while a departure from traditional mining discovery rules, signals its special attitude toward oil shale as a natural resource in contrast to other locatable minerals. Congressional hearings and debates disclose that oil shale was perceived as valuable, indeed crucial to the national security and welfare; oil shale was seen as the life blood of the United States Navy for its fleet and guaranteed an adequate fuel supply to the country. Congress believed that commercial development of oil shale would soon be feasible because it perceived rapid depletion of existing resources in oil. That attitude persisted with varying strength throughout the years and continues today. Consequently, various means have been sought to develop of oil shale. One technique is Congressional approval of the *Freeman* rules of discovery. The Supreme Court solidified this interpretation in *Andrus.* The discovery rules of *Freeman* are an integral part of oil shale mining law. The Department is bound by this principle.

---

**31.** We discuss *Bohme I,* which concerned mainly assessment work requirements, in Appendix A.

**32.** The Parachute Creek Member of the Green River Formation is exposed physically on each

---

5. *United States v. Bohme,* 51 I.B.L.A. 97 (1980) (*Bohme II*)

Following *Andrus,* the Interior Board of Land Appeals issued a supplemental decision in *United States v. Bohme,* 51 I.B.L.A. 97 (1980) (*Bohme II*),[31] holding that "oil shale is now a prospectively valuable mineral with respect to which present marketability need not be shown..... [A]s we read *Freeman,* an exposure of the Parachute Creek Member, even though of limited extent, can be geologically inferred to embrace sufficient quality of high grade oil shale so as to constitute a valuable mineral."[32] *Bohme,* 51 I.B.L.A. at 103–04. The Department's discovery standards adopt *Freeman.* The *Freeman* rule, as interpreted in *Andrus,* is the rule of analysis used in plaintiffs' mineral report.

### ORDER

ACCORDINGLY, IT IS ORDERED that a writ of mandamus shall issue in favor of plaintiffs Marathon Oil Company, Joan L. Savage, Barbara Cliff Toner, and Frank G. Cooley, as personal representative of the Estate of Cameron Cliff, requiring that the defendants Manuel Lujan, Jr., Secretary of the Interior, Delos Sy Jamison, Director, Bureau of Land Management, and the Department of the Interior, expeditiously complete administrative action on patent application No. C–43354 for Portland Claim Nos. 1–6, Rio Blanco County, Colorado. Patents shall issue on or before Friday, July 20, 1990.

IT IS FURTHER ORDERED that the defendants are hereby enjoined from failing to complete administrative action on patent application C–43354 and from failing to issue to plaintiffs patents for Portland Claim Nos. 1–6.

IT IS FURTHER ORDERED that defendants have violated 30 U.S.C. § 29 and 5 U.S.C. § 555(b) in failing to complete ad-

---

of plaintiffs' claims, and the rich Mahogany Zone lies at or near the surface on all the claims under less than 500 feet of overburden. Plaintiffs' Proposed Findings and Order (referring to Finding 4 of the Mineral Examination Report).

ministrative action and to issue patents for patent application No. C–43354, Portland Claim Nos. 1–6.

IT IS FURTHER ORDERED that as an alternative and separate ruling on the issue of summary judgment, there is no question of material fact and plaintiffs are entitled to judgment as a matter of law. Therefore, plaintiffs' motion for summary judgment is GRANTED and defendants' motion for summary judgment is DENIED.

IT IS FURTHER ORDERED the issues in this action are found in favor of plaintiffs and against defendants. This court shall retain jurisdiction over this case until such time as the Department issues the above said mineral patents.

IT IS FURTHER ORDERED that all parties shall bear their own costs and attorneys' fees.

The Clerk of the Court is DIRECTED to enter judgment according to the orders listed herein, in favor of plaintiffs and against the defendants.

## JUDGMENT

PURSUANT TO and in accordance with the Memorandum Opinion and Order entered on June 20, 1990, by the undersigned, it is

ORDERED that a writ of mandamus shall issue in favor of plaintiffs Marathon Oil Company, Joan L. Savage, Barbara Cliff Toner, and Frank G. Cooley, as personal representative of the Estate of Cameron Cliff, requiring that the defendants Manuel Lujan, Jr., Secretary of the Interior, Delos Sy Jamison, Director, Bureau of Land Management, and the Department of the Interior, expeditiously complete administrative action on patent application No. C–43354 for Portland Claim Nos. 1–6, Rio Blanco County, Colorado. Patents shall issue on or before Friday, July 20, 1990. It is

FURTHER ORDERED that the defendants are hereby enjoined from failing to complete administrative action on patent application C–43354 and from failing to issue to plaintiffs patents for Portland Claim Nos. 1–6. It is

FURTHER ORDERED that defendants have violated 30 U.S.C. § 29 and 5 U.S.C. § 555(b) in failing to complete administrative action and to issue patents for patent application No. C–43354, Portland Claim Nos. 1–6. It is

FURTHER ORDERED that as an alternative and separate ruling on the issue of summary judgment, there is no question of material fact and plaintiffs are entitled to judgment as a matter of law. Therefore, plaintiffs' motion for summary judgment is GRANTED and defendants' motion for summary judgment is DENIED. It is

FURTHER ORDERED the issues in this action are found in favor of plaintiffs and against defendants. This court shall retain jurisdiction over this case until such time as the Department issues the above said mineral patents. It is

FURTHER ORDERED that all parties shall bear their own costs and attorneys' fees.

## APPENDIX A

General Overview of Mining Law Regarding Oil Shale Claims

A reading of legal precedents and Interior decisions, rules, standards and directives, as well as Supreme Court, court of appeals, and district court decisions spanning sixty years points out disputes and uncertainties in interpreting legal principles concerning oil shale. We focus particularly on the history of law regarding discovery and assessment work requirements. Such disparate and inconsistent Departmental decisions cloud mining jurisprudence.[33]

33. Treatise and law review commentary evidences the confusion surrounding the validity of pre–1920 oil shale claims: Blair, *Cancellation of Oil and Gas Leases—An Administrative or Judicial Function?* 51 Geo.L.J. 221 (1963); Blumenschein and Colvert, *Performance of Assessment Work on Unpatented Mining Claims,* 4 Nat.Resources J. 251 (1971); Braunstein, *All that Glitters: Discovering the Meaning of Mineral in the Mining Law of 1872,* 21 Land and Water Rev. 297 (1986); Braunstein, *Natural Environments and Natural Resources: An Economic Analysis*

### 1. Mining Claims Prior to 1920

The early mining laws, Act of July 4, 1866, Act of May 10, 1872 and Act of June 22, 1874, now generally 30 U.S.C. § 22 *et seq.*, state that citizens may enter and explore the public domain and search for minerals. Oil shale claims could be located in the same manner as mining claims of other minerals. Unpatented mining claims were recognized as a unique estate in land, entitling the claimant to exclusive possession of his claim for mining purposes. The estate could be enlarged to a fee simple interest if the claim went to patent.

### 2. Mineral Leasing Act of 1920

In 1920, Congress substantially changed this procedure and enacted the Mineral Leasing Act (the "Act") 30 U.S.C. § 181 *et seq.* The Act withdraws oil shale and sev-

and *New Interpretation of the General Mining Law*, 32 U.C.L.A.Law Rev. 1061 (1985); Cooley, *Physical Background—Oil Shale*, 59 Q. of Colo. Sch. of Mines 135 (1964); Craig, *Representations by Public Bodies*, 93 L.Q.Rev. 398 (1977); Delaney, *Water for Oil Shale Development*, 43 Den.U. L.Rev. 72 (1966); Dempsey, Sherman and Neslin, *Obtaining Surface Rights to Non–Mineral Federal Land by Purchase, Exchange, Permit and Location*, 31 Proc. Rocky Mtn.Min.L.Inst. 8–2, 8–42 to 8–46 (1985); Flora, *Oil Shale and the Mining Laws*, 27 Dicta 195 (1950); Haggard and Curry, *Recent Developments in the Law of Discovery*, 30 Proc.Rocky Mtn.Min.L.Inst. 8–3 to 8–48 (1984); Hill, *Placer Mining Claims—Selected Problems and Suggested Solutions*, 23 Rocky Mtn.Min.L.Inst. 517 (1980); Knutson and Morris, *Locating, Maintaining and Patenting Groups or Large Blocks of Mining Claims*, 23 Rocky Mtn.Min.L.Inst. 517 (1980); Lohr, *Conclusiveness of Oil Shale Placer Mining Claim Patents*, 43 Den.U.L.Rev. 24 (1966); Marsh and Sherwood, *Metamorphosis in Mining Law: Federal Legislative and Regulatory Amendment and Supplementation of the General Mining Law Since 1955*, 26 Rocky Mtn.Min.L.Inst. 209 (1980); Mayer, *The 1872 Mining Law: Historical Origins of the Discovery Rule*, 53 U.Chi.L.Rev. 624 (1986); Meek, *Records, Documents and Services of the Colorado Land Office, Bureau of Land Management*, 43 Den.U.L.Rev. 83 (1966); Miller, *Surface Use Rights Under the General Mining Law: Good Faith and Common Sense*, 29 Rocky Mtn.Min.L.Inst. 79 (1982); Mock, *The Oil Shale Advisory Board*, 43 Den.L.J. 47 (1966); Moran and Ebner, *The Mineral Patent*, 24 Rocky Mtn. Min.L.Inst. 269 (1978); Morris, *The Middle Initial*, 37 Dicta 361 (1960); Nelson, *Assessment Work—Before and After the Oil Shale Case*, 17 Rocky Mtn.Min.L.Inst. 435 (1972); Outerbridge and Sherwood, *Recordation and Filing of Unpatented Mining Claims and Sites with the Federal Government*, 21 Ariz.L.Rev. 433 (1979); Reidy, *Do Unpatented Oil Shale Mining Claims Exist?* 43 Den.U.L.Rev. (1966); Schmidt, *Status of Unpatented Mining Claims*, 59 Q. of Colo Sch. of Mines 125 (1964); Schopflacher, *The Doctrine of Res Judicata in Administrative Law*, 1942 Wis.L. Rev. 5 (1942); Short, *Wilderness Policies and Mineral Potential on the Public Lands*, 26 Rocky Mtn.Min.L.Inst. 39 (1980); Steadman, *"Forgive U.S. Its Trespasses?": Land Title Disputes with*

the *Sovereign—Present Remedies and Prospective Reform*, 1971 Duke L.J. 15 (1972); Sturgis, *Administrative and Judicial Review of Interior Department Decisions*, 31 Rocky Mtn.Min.L.Inst. 60 (1985); Turner, *Problems Incident to Unpatented Mining Claims Assessment Work Requirements*, 3 Rocky Mtn.Min.L.Inst. 455 (1957); Comment, *Andrus v. Shell Oil Co.: Portent for the Future?* 11 Envtl.L. 721 (1981); Comment, *Mining Law: Annual Assessment Work, New Directions, the Need to Include Antiquities Surveys*, 20 Nat.Resources J. 933 (1980); Comment, *The "Associated Minerals" Dilemma and the New Federal Oil Shale Policy*, 39 U.Colo.L.Rev. 370 (1967); Comment, *The 1872 Mining Law: A Statute By-Passed by Twentieth Century Technology and Public Policy*, 1981 Utah L.Rev. 575, 582 (1981); Comment, *The General Mining Law and the Doctrine of Pedis Possessio: The Case for Congressional Action*, 49 U.Chi.L.Rev. 1026 (1982); Note, *Government Initiated Contests Against Mining Claims: A Continuing Conflict*, 1968 Utah L.Rev. 102 (1968); Note, *Disputed Oil Shale Claims—Background and Current Conflict*, 51 Minn.L.Rev. 1154 (1967); Note, *Annual Assessment Work as Notice to Prospectors*, 6 Utah L.Rev. 391 (1937); Note, *Marketability and the Mining Law—The Effect of U.S. v. Coleman*, 10 Ariz.L.Rev. 391 (1968); 2 *American Law of Mining* §§ 45.04[1]—45.04[7] (2d ed. 1984); Davis, *Administrative Law of the Seventies* (1976); C. Mayer & G. Riley, *Public Domain, Private Dominion* ch. 3 (1985); R. Pruitt, Jr. *Digest of Mining Claim Laws* (3d ed.1986); U.S. Dep't of the Interior, *Final Environmental Statement for the Prototype Oil Shale Leasing Program* (1973); *Annual Assessment Work Manual*, Rocky Mtn. Min.L.Inst. (Don Sherwood, Ed.1972); Colorado Governor's Oil Shale Advisory Committee, *Report on Economics of Environmental Protection for a Federal Oil Shale Leasing Program*, prepared for Director of Natural Resources of the State of Colorado (January 1971); *Lindley on Mines* (3d ed. 1914); *Morrison's Mining Rights* (16th ed. 1936); *Legal Study of Oil Shale on Public Lands*, Public Land Law Review Commission, (Widman and Brightwell, Eds., 1969); *On the Federal Oil Shale Program, Hearings Before the Committee on Interior and Insular Affairs, United States Senate*, 90th Cong. 1st Sess., (February 21, 22, and September 14, 15, 1967).

eral other minerals from general mining law and provides that thereafter such minerals can only be leased. 30 U.S.C. § 193. If claimants discover "valuable mineral deposits," they may obtain title to land on which deposits are located. The Act expressly prevents location of new oil shale claims after its enactment on February 25, 1920.

Thus, mineral lands located after that date can not pass into wholly private ownership. Significantly, the Act contains a "savings clause" providing that claims located prior to 1920 can reduce to patent and pass into private ownership if "thereafter maintained in compliance with the law under which initiated." 30 U.S.C. § 193. The savings clause is the source of varied interpretations and has prompted considerable litigation.

3. 1920's–1930's

In the 1920's and 1930's, the Department either wholly or partially invalidated many claims for improper maintenance within the meaning of sections 28 and 37 of the Act—claimants had not performed required annual assessment work. The Department interpreted the Mineral Leasing Act to place the government in the position of an adverse or rival claim locator. *Krushnic Interior Department Case*, 52 I.D. 295 (1928) succinctly sets for the policy: Only as an adverse locator and claimant can the government raise numerous objections to issuance of patents including nonperformance of annual assessment work. Until then, objections could be raised solely by private non-government adverse or rival locators. As an adverse locator, the government can terminate claims automatically and reclaim all lands on which assessment work lapses.

For a period, the government's position was generally upheld in Departmental administrative proceedings. On appeal, two Supreme Court decisions, however, took the opposite position. The Court held in both cases that Departmental invalidations of oil shale claims for nonperformance of annual assessment work is improper. The first decision, *Wilbur v. United States ex rel. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930), held that the Department can not invalidate oil shale claims for nonperformance of assessment work if work is resumed before contest proceedings are initiated.

The second decision, *Ickes v. Virginia–Colorado Dev. Corp.*, 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627 (1935), nullified the government's position as rival locator and held that the Department has no jurisdiction to invalidate claims for nonperformance of assessment work. Failure to do assessment work inures only to the benefit of rival claimants, not the government. The case also held that prior to enactment of the Mineral Leasing Act the government acquired no rights against claimants because they failed to perform assessment work: such a Departmental challenge "went beyond the authority conferred by law." *Virginia–Colorado*, 295 U.S. at 647, 55 S.Ct. at 890.

After the Supreme Court decision in *Krushnic*, but before *Virginia–Colorado*, the Department allowed the government to void claims for failure to perform assessment work if the government challenged claims before work resumed. *Federal Shale Oil Co.*, 53 I.D. 213, 220 (1930). Under the procedure, claimants were notified to appear at hearings that contested their claims. Few appeared, and few appealed; the Department invalidated 22,000 claims involving 2,700,000 acres until 1933, when *Virginia–Colorado* nullified the government's position.

4. 1930's–1960's

From 1935 until the early 1960's, the Department consistently issued patents on claims declared invalid in the late 1920's and early 1930's. In Colorado alone, the Department issued patents on 106 applications totaling 768 oil shale claims in Colorado from 1935 through 1961. Five hundred seven of these claims, covered by seventy-one applications, were earlier declared null and void for nonperformance of assessment work.

As fully and as finally as an administrative court can speak, the Department followed *Virginia–Colorado* in *The Shale Oil Company*, 55 I.D. 287 (1935). *Shale Oil* absolutely terminated nonperformance of assessment work as an impediment to obtaining a patent. Review of Departmental communications, public announcements and correspondence fortifies our opinion.[34]

In 1964 the Department abruptly reversed its position in *Union Oil Co. of California*, 71 I.D. 169 (1964), *Supplemental Decision*, 72 I.D. 313 (1965). The decision again invalidated claims and held that although the old cancellation decisions were erroneous, they nevertheless were final. Thus, *Union Oil* suddenly departed from an established position, resurrected already invalid contest proceedings, reversed, and overruled administrative decisions of the 1920's and 1930's.

Thus, from review and analysis of holdings in *Udall, Hickel, Andrus, Shale Oil*, decisional and statutory law, administrative proceedings purportedly canceling claims are invalid and of no effect.

 5. 1966–1970 Impact Cases: *Oil Shale Corp. v. Udall* (D.Colo.1966); *Hickel v. Oil Shale Corp*, 400 U.S. 48 (1970)

On appeal to the district court, *Oil Shale Corp. v. Udall*, 261 F.Supp. 954 (D.Colo. 1966), *aff'd, Udall v. Oil Shale Corp.*, 406 F.2d 759 (10th Cir.1969), *rev'd, Hickel, supra*, reverses *Union Oil*. In *Oil Shale Corp. v. Udall*, 261 F.Supp. 954 (D.Colo. 1966), plaintiff Oil Shale claimants argued to revalidate their claims. They argued that nonperformance of assessment work is not a requirement to maintain a claim within the meaning of § 37 of the Mineral Leasing Act, and that the Department has no jurisdiction to void plaintiffs' claims.

The district court upheld plaintiffs, stating that the 1930's contest proceedings voiding claims are invalid, and that the Department exceeded its jurisdiction in voiding the claims for assessment work

failure. *Oil Shale Corp.*, 261 F.Supp. at 954. The opinion is based in part on *Krushnic* and *Virginia–Colorado*.

The appellate court affirmed the trial court's ruling. *Udall*, 406 F.2d 759 (Seth, J.). The opinion illuminates the question of Departmental power, authority and jurisdiction, and completely voids the Department's acts. The *Udall* opinion, quoting from *West v. Standard Oil Co.*, 278 U.S. 200, 220, 49 S.Ct. 138, 144, 73 L.Ed. 265 (1929), states:

> The broad power of control and supervision conferred upon the Secretary does not clothe him with any discretion to enlarge or curtail the rights of the grantee, nor to substitute his judgment for the will of Congress as manifested in the granting act. *Payne v. Central Pacific Railways Co.*, 255 U.S. 228 [41 S.Ct. 314, 65 L.Ed. 598] (1921).

*Udall* at 764.

On appeal the Supreme Court narrowly reversed *Udall*. In *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, the Supreme Court, in a plurality ruling, reversed the holdings of the district and circuit courts. Justices Harlan, White and Marshall took no part in the decision. Chief Justice Burger and Justice Stewart dissented. The Court ruled that the United States is the beneficiary of any claims on which assessment work is performed because the Mineral Leasing Act precludes any new location of claims. Another locator is necessarily a new locator. The Supreme Court concluded that the Department has subject matter jurisdiction to void claims if the assessment work performed on them does not amount to "substantial compliance" with 30 U.S.C. § 28. *Hickel*, 400 U.S. at 48, 91 S.Ct. at 196.

Significantly, the Court did not overrule *Krushnic* and *Virginia–Colorado*, forming the basis of the dissents by Chief Justice Burger and Justice Stewart. The Court left a "narrow ambit" occupied by those cases in which a claimant who has substantially complied with assessment

---

**34.** We discuss this central legal and factual point in our *Tosco* opinion in great detail. For purposes here, we abbreviate our discussion.

work requirements can shelter and preserve his claim. *Hickel*, 400 U.S. at 51, 91 S.Ct. at 198. Also, *Krushnic* and *Virginia–Colorado* are cases that reflect "a judicial attitude of fair treatment for claimants who have substantially completed the assessment work required by 30 U.S.C. § 28." *Hickel*, 400 U.S. at 52, 91 S.Ct. at 199. Other pronouncements in *Krushnic* and *Virginia–Colorado* are dicta. The Court agreed that every default in assessment work should not result in forfeiture.

The Court also addressed the issue of patenting already invalidated claims, as raised by *Shale Oil Co.* and Departmental policy:

> [T]hese contentions present questions not decided below. Therefore, on remand all issues relevant to the current validity of those contest proceedings will be open, including the availability of judicial review at this time. To the extent that they are found void, not controlling, or subject to review, all issues relevant to the invalidity of the claims will be open, including inadequate assessment work, abandonment, fraud, and the like. Likewise, all issues concerning the time, amount, and nature of the assessment work will be open so that the claimants will have an opportunity to bring their claims within the narrow ambit of *Krushnic* and *Virginia–Colorado,* as we have construed and limited these opinions.

*Hickel,* 400 U.S. at 58, 91 S.Ct. at 201.

The "substantial compliance" standard in *Hickel* requires less than actual and strict compliance.[35] Substantial compliance called for in 30 U.S.C. § 28 and in those cases interpreting the statute, demands primarily a locator's good faith effort to develop the claim and to facilitate eventual extraction of minerals from the earth.

The most recent interpretation of *Hickel* is found in *United States v. Locke,* 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985). In *Locke,* the Court rejected that filing proof of assessment work one day late constitutes compliance. The Court concluded that *Hickel's* "discussion of substantial compliance [was] inapposite to the statutory scheme at issue [in *Locke* ]." 43 U.S.C. § 1744; *Locke,* 471 U.S. at 102, 105 S.Ct. at 1796.

According to the Court, the assessment work requirement in *Hickel* is simply one indicia of a claimant's specific intent to retain a claim. Thus, full compliance with assessment work requirements establishes conclusively a claimant's intent to keep the claim. However, less than full compliance subjects the mine owner to a determination of whether he intends to keep his claim, although it does *not* result in automatic loss of the claim as in *Locke. Locke,* 471 U.S. at 84, 105 S.Ct. at 1787.

The Court in *Locke* determined that the mining claimant's intent is simply not relevant without the necessary filing. Title 43 U.S.C. § 1744 expressly provides that a claim is lost if the party fails to file documents required by federal law in a timely manner. No such provision is included in the assessment statute under consideration in *Hickel. Locke,* 471 U.S. at 84, 105 S.Ct. at 1787. The claims are protected from invalidation where substantial compliance with annual assessment work requirement exists "so that the 'possessory title' of the claimant, granted by 30 U.S.C. § 26, will not be *disturbed* on flimsy or insubstantial grounds." *Hickel,* 400 U.S. at 57, 91 S.Ct. at 201 (emphasis added).

Considering *Locke, Hickel, Krushnic,* and *Virginia–Colorado* in harmony, the law is as follows: The Department may void claims for lack of assessment work required by § 28, but *cannot* void claims for literal or insubstantial noncompliance with the requirement. Claims are protected from invalidation where the claimant complies substantially assessment work requirements. The claimant's possessory title, granted by 30 U.S.C. § 26, will not be disturbed on flimsy or insubstantial

---

**35.** The analysis set forth in our opinion establishes a workable rather than a rigid yardstick for determination. We give meaning to *Hickel*

that is within the spirit and tenor of applicable statutes, Congressional expression, decisional law and precedents.

grounds. *Hickel,* 400 U.S. at 57, 91 S.Ct. at 201.

6. 1970–1980 Additional Court Cases and Administrative Proceedings: *Oil Shale Corp. v. Morton,* 370 F.Supp. 108 (D.Colo.1973); *United States v. Bohme,* 87 I.D. 248 (1980) (*Bohme I*); *United States v. Weber Oil Co.,* 89 I.D. 538 (1982)

After the Supreme Court ruled in *Hickel,* the case was remanded to the district court. *Oil Shale Corp. v. Morton,* 370 F.Supp. 108 (D.Colo.1973). The district court ruled as follows: (1) the assessment work decisions relied on in *Union Oil* 71 I.D. 169 (1964) are rescinded and vacated in *The Shale Oil Company,* 55 I.D. 287 (1935), decision; (2) the longstanding and widely publicized position of the Department after 1935, that the old assessment work decisions are nullities and that performance of assessment work is not necessary to maintain the validity of an oil shale claim as against the United States, constitutes a rule of law that the Department can not retroactively repudiate; (3) the Department is estopped from asserting the validity of the old assessment work decisions; and (4) the original *Union Oil* decisions should be set aside for procedural deficiencies.

On appeal, the court of appeals vacated the district court holdings and, while expressing no view as to its merits, remanded the case to the district court so that all legal and factual issues could be ascertained before further appeal. Where necessary, issues were remanded to the Department for factual hearings at administrative proceedings. *Morton, supra* note 2, Order of Remand.

Following remand, the Department initiated contests before an administrative law judge on assessment work issues. Discovery issues were held in abeyance pending the Supreme Court's decision on the point. The Board held that in assessment work contests, the Department's burden of proof is limited to establishing a prima facie case; the ultimate burden of adequacy of performance of annual work shifts to contestees.

On appeal, the Interior Board of Land Appeals in *United States v. Bohme,* 87 I.D. 248 (1980) (*Bohme I*), completely rejected the following rulings of the administrative law judge with respect to assessment work: (1) only a reasonably persistent effort to perform annual assessment work is required under the applicable statute; (2) rigid compliance is not required; and (3) occasional failures of annual work are not fatal to validity of the claim. The interpretation of *Hickel* by the Interior Board of Land Appeals is at variance with the holding of the administrative law judge on the same legal point based on the same set of facts.

In 1981, the Department initiated further administrative contests raising the assessment work and discovery issues in addition to issues alleging improper posting and marking, abandonment, lack of good faith, fraudulent location and invalidity based on previous decisions. On appeal, *United States v. Weber Oil Co.,* 89 I.D. 538 (1982), the Board adhered to its rulings in *Bohme I* (and *Bohme II,* discussed *infra*) regarding assessment work and discovery issues. Additional issues were dismissed on failure of burden of proof on the critical issue of discovery. The Board stated:

> The Parachute Creek member does outcrop, totally uncovered by the barren Uinta formation, at places where erosion has cut through the Uinta formation, such as along streams and drainages, thereby exposing the rich oil shale of the Parachute Creek member. As discussed below, some of the present claims contain such outcrops, and there is no question that there has been "discovery" on these claims.

> However, the principal surface deposits of oil shale found in the Uinta formation are not outcroppings of the rich Parachute Creek member, but are instead "tongues" of marlstone of inferior quality. Although these tongues of lean marlstone are thought to meet the Parachute Creek member at depth, they do so at great lateral distance from the surface outcroppings, on the order of tens of

miles. Thus, these tongues of marlstone cannot be followed to depth to the rich deposit of the Parachute Creek member within the limits of any mining claim.

*Weber*, 89 I.D. at 542.[36]

7. Additional Effort by Interior to Invalidate Patents: *United States v. Eaton Shale Co.*, 533 F.Supp. 1256 (D.Colo.1977).

Questions of whether prior contest decisions invalidating oil shale placer claims for lack of assessment work constitute *res judicata*, and whether a proper patent can be invalidated by direct action in federal district court, are addressed in *United States v. Eaton Shale Co.*, 433 F.Supp. 1256 (D.Colo.1977). The action was brought by the United States to invalidate a land patent issued in 1951 on the ground that six oil shale placer mining claims on which the patent was premised did not exist at the time of its issuance. The government's attack on the patent's validity was based, in part, upon a 1931 contest decision initiated by the Commissioner of the General Land Office ("GLO") declaring the claims null and void for lack of assessment work.

In rejecting the government's position, the district court found that the patent was issued with the government's full knowledge of the 1931 GLO decision holding the claims null and void. The district court reviewed relevant court and administrative proceedings, including the Supreme Court decision in *Hickel*. In ruling that the government can not cancel a patent properly issued by authorized government employees, the district court applied principles of estoppel and laches. In addition, the court found that the original claimant neither abandoned nor relinquished the mining claims and that the 1931 adverse contest decision had no effect on the validity of claims.

The district court further held that: (1) nothing in the administrative file indicated that the government properly served process on claim holders; (2) no claim holders were notified of contests against the claims in the 1931 contest proceedings; and (3) that the Commissioner of the GLO previously held that charges and proceedings under the earlier notice were ineffective. It is significant that *Eaton* was never appealed. The holding reasonably limits the Department's power even though interests in public lands are involved.

## APPENDIX B

### Oil Shale

To understand the nature of the disputes over validity of the mineral deposits, background knowledge of oil shale and oil shale formations is necessary. Oil shale is processed from a fine-grained sedimentary rock.[37] The rock is marlstone, which contains a solid, organic, rubbery substance called kerogen. When properly processed and distilled, kerogen yields a fluid hydrocarbon substance called shale oil.

Shale oil can then be refined into products similar to those derived from crude petroleum. The primary chemical difference between the two products is geometric in its molecular structure. Heating kerogen to a temperature between 500 and 900 degrees Fahrenheit yields shale oil. Likewise, heating shale oil refines 25 to 75 percent of the organic matter in shale oil into oil and gas, which is a replacement fuel for oil and gas in conventional combustion engines, boilers or furnaces.

Shale oil rock contains billions of barrels of untapped petroleum resources. In the United States, oil shale rock contains more than 2,000 billion barrels of petroleum, or 42 U.S. gallons per barrel. This resource constitutes approximately twenty-five times the total oil production in this coun-

---

36. Appendix B discusses the geology of oil shale formation in greater detail.

37. The Supreme Court defined oil shale as "a sedimentary rock containing an organic material called kerogen which, upon destructive distil-

lation, produces a substantial amount of oil." *Andrus*, 446 U.S. at 658, n. 3, 100 S.Ct. at 1934, n. 3. *See also* U.S. Department of the Interior, *Final Environmental Statement for the Prototype Oil Shale Leasing Program*, 5–38 (1975).

try throughout its history.[38] Oil shale deposits in the United States are an enormous potential low-grade source of oil, hydrocarbon gas or solid fuel. Demonstrated methods of extraction will yield about 80 billion barrels of oil from the more accessible higher grade deposits of the central Rocky Mountain region, at costs approaching current costs of petroleum of comparable quality.

The richest and highest grade oil shale deposits extend through the Green River Formation, which comprises some 2,600 square miles in Colorado, 4,700 square miles in Utah, and 9,200 square miles in Wyoming. The most extensive deposits of high grade oil shale are in the Piceance Basin in Colorado. Here, a rich oil shale layer is 50 to 100 feet thick.

The oil shale in the Piceance Basin, a portion of the Green River Formation, is estimated to contain 1,300 billion barrels. Three hundred thirty-eight thousand acres of land containing over 100 billion barrels are already in private hands. The federal domain, which contains the most extensive and richest deposits, covers about 600,000 acres and is estimated to contain nearly one trillion barrels of oil. Approximately seventy-five percent of the oil shale lands in northwestern Colorado are federally owned.

Current geological theory postulates that the Green River Formation was deposited during the prehistoric Eocene era in Lake Uinta, a large, deep, and stable body of fresh water. Layers of organic material, such as vegetation and aquatic life, and layers of inorganic matter settled in the lake over millions of years. The result was laminated rocks, or marlstone, of lateral persistency; that is, they were rarely folded or faulted or unevenly bedded.

The Green River Formation is "intertongued" with the Uinta Formation which developed during the latter history of Lake Uinta. Streams entered the lake and deposited primarily inorganic material. Thus, as the lake filled in, the rocks "intertongued" so that inorganic Uinta material shows in some places and organic Green River material shows in others. Erosion later cut into the rocks and exposed the rich oil shale beds. Thus, the geology of the area is apparent and was known before this century.

---

**38.** *See* Oil Shale Advisory Board to Secretary of Interior, *Interim Report, II. Background Information,* (Feb. 1, 1965).